**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ENDURANCE WARRANTY SERVICES,** | ) | Case No. |
| **L.L.C., an Illinois limited liability company;** | ) | |
| | ) | |
| Plaintiff, | ) | **JURY DEMAND** |
| | ) | |
| v. | ) | |
| | ) | |
| **PELICAN INVESTMENT HOLDINGS, LLC, a** | ) | |
| **Delaware limited liability company, and** | ) | |
| **NATIONAL ADMINISTRATIVE SERVICE** | ) | |
| **CO., LLC, an Ohio limited liability company,** | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Endurance Warranty Services, L.L.C. ("Endurance" or "Plaintiff"), for its

Complaint for Injunctive and Other Relief against Defendants Pelican Investment Holdings, LLC

("Pelican") and National Administrative Service Co., LLC ("NASC") (collectively, Pelican and

NASC are referred to as the "Defendants"), states as follows:

## NATURE OF THE ACTION

1.     This is an action for injunctive relief and damages arising out of Defendants'

trade secret misappropriation, false advertising, and unfair competition. Endurance brings its

claims under the Defend Trade Secrets Act ("DTSA"), Illinois Uniform Trade Secrets Act

("ITSA"), the Lanham Act, and state common law. Relevant to this lawsuit, rather than fairly

compete, Defendants have engaged in a multi-jurisdictional, multi-party scheme[1] whereby it is

---

[1] These same Defendants were also sued in a separate case involving NRRM, LLC, doing business as CarShield, styled as *NRRM, LLC et al. v. Pelican Investment Holdings, LLC*, 4:25-cv-01566 (E.D. Mo. Oct. 20, 2025). Through that case, CarShield has sued Defendants for Lanham Act violations for markedly similar conduct to that about which Endurance now complains and seeks injunctive relief.

using Endurance's trade secret customer lists to improperly contact and target Endurance's customers, during which calls Pelican and, according to some callers, NASC, directly, use false and deceptive practices to steal customers from Endurance and induce Endurance's customers to purchase NASC's competing vehicle service contract products. Endurance now seeks temporary, preliminary, and permanent injunctive relief to stop Defendants' trade secret misappropriation and Lanham Act violations, as well as seeking monetary damages and other relief through this lawsuit.

2.      Endurance was founded in 2006, and is the nation's premier direct-to-consumer provider of vehicle service contracts. Vehicle service contracts supply consumers with peace-of-mind after a vehicle manufacturer's original warranty expires, and provides coverage for the cost of future repairs to consumers.

3.      Through its service model, Endurance provides the most comprehensive and customer-centric auto protection. Endurance is one of the largest providers of vehicle protection coverage in the nation and is backed by A-rated insurance companies. Endurance enjoys an excellent reputation and the esteem of the consumers it serves, and of the industry, generally. Endurance is also fairly unique from other service providers in the vehicle service contract industry in that it does not outsource administration of claims to third parties, though it does sell some vehicle service contracts for other third-party administrators.

4.      Vehicle service contracts (sometimes referred to as extended auto warranties) help consumers avoid potential out-of-pocket repairs not otherwise covered by typical automobile insurance. Vehicle service contracts are aftermarket contracts offered by companies to cover future repair costs for when a vehicle manufacturer's original warranty expires.

5.      Endurance has worked hard through the years to develop its reputation and works

2

harder to attract and maintain its clients. Endurance utilizes state-of-the-art, customized Customer Relationship Management software to identify and store customer leads and spends millions per year to market its products across a host of different platforms. Through these leads, Endurance prepares customized quotes for each potential customer, based on individualized information unique to the customer, such as the make and model of the car, year of manufacture, odometer readings, and other items.

6.      Endurance has learned from a former sales representative of Auto Service Center, a DBA of Pelican, that it, at a minimum, rather than fairly compete for business in this space, has surreptitiously acquired and is acquiring Endurance's customer list and contact information and specifically targeting Endurance's customers for the purpose of selling contracts. Endurance has also received calls from customers that NASC is also specifically targeting Endurance's customer base and Endurance is informed and believes that NASC has likewise obtained Endurance's customer list and is targeting Endurance's customers. Indeed, in one such call that an Endurance customer received from Defendants, the sales representative simultaneously said the company held itself out as both "ASD" and "NASC" (also referring to it as "National Administrative Solutions Corporation") in the same call.[2]

7.      Endurance's customers and their contact information are not publicly-available information, and Endurance takes significant efforts to protect this information, because Endurance's customer list provides it a competitive advantage based on it being secret.

8.      As if Defendants' trade secret misappropriation was not enough, though, Defendants have taken an added step: because once its sales representatives connect with

---

[2] This particular Endurance Customer, Brandon Salm, is employed by Endurance.

3

Endurance's customers, they levy false accusations against Endurance in an effort to move, often successfully, those customers from Endurance to Defendants.

9. In the course of these calls, Defendants or their agents make specific, demonstrably false statements or highly misleading statements about Endurance, with the intent of inducing consumers to terminate their Endurance vehicle service contracts and begin doing business with Defendants.

10. Among these statements, Defendants or its sales representatives are telling Endurance customers *__falsely__* that: (a) Endurance is being sued by a federal agency; (b) Endurance is going out of business; and/or (c) Endurance's policies are no longer in effect.

11. Further, through these calls, Endurance has received further evidence that Defendants are specifically targeting Endurance's customers, with knowledge of the customer's names, contact information, and contracts with Endurance, none of which is publicly available information, further evidencing, at a minimum, Pelican's trade secret misappropriation (based on the information that Endurance received from a former Pelican sales representative).

12. In many of these calls, customers have expressed concern about *Endurance's* business practices given that Defendants possess Endurance's customers' contact information. In other words, Endurance's customers are concerned that Endurance has done something wrong, even though it is Defendants who have by misappropriating and using Endurance's misappropriated information. This is further causing Endurance's goodwill to be harmed.

13. Endurance has recorded conversations in which customers relay the false and misleading statements that Defendants' sales representatives are making to Endurance's customers.

14. Defendants' conduct has led to the actual loss of business for Endurance.

4

15.     By making these false and misleading statements, Defendants unlawfully diverted consumers from Endurance to Defendants, damaged Endurance's goodwill and credibility in the marketplace, and unlawfully distort competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

16.     Unfortunately, Defendants' deceptive trade practices are nothing new. Indeed, Defendants are currently being sued by CarShield, another company focusing on selling vehicle service contracts, in the Eastern District of Missouri for the same conduct and the same misleading statements, albeit about CarShield.

17.     Moreover, Defendants have been sued countless times for deceptive trade practices throughout the country, including for TCPA class action claims and other fraudulent practices.

18.     Before Endurance's confidential and trade secret information, customer relationships, and goodwill are further eroded, Endurance seeks temporary, preliminary, and permanent injunctive relief to protect the intrinsic value of its confidential information, customer relationships, and goodwill.

19.     Endurance also seeks all of the damages it has suffered as a result of Defendants' ongoing actions.

## **PARTIES**

20.     Plaintiff Endurance Warranty Services, L.L.C. is an Illinois limited liability company, with its principal place of business in Northbrook, Illinois.

21.     Defendant Pelican Investment Holdings, LLC is a Delaware limited liability company, with its principal place of business in West Palm Beach, Florida.

22.     Defendant National Administrative Service Co., LLC is an Ohio limited liability

5

company, with its principal place of business in Dublin, Ohio.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Endurance's Defend Trade Secrets Act ("DTSA") claim, brought under 18 U.S.C. §1836, et seq., and its Lanham Act claim raise federal questions. This Court has supplemental jurisdiction over the remaining claims, pursuant to 28 U.S.C. § 1367(a).

24.     This Court has personal jurisdiction over Pelican and NASC, and venue is proper in this District under 28 U.S.C. § 1391(a), because Defendants committed and continue to commit tortious acts in and related to this State, as well as having performed acts that constitute doing business within the state of Illinois. To wit, Defendants committed and continue to commit tortious acts in and/or related to this State, as well as having performed acts that constitute doing business within the state of Illinois.

25.     Venue also is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

26.     Specifically, Pelican—doing business as Auto Service Department, ASD, Auto Service Company, ASC, Affordable Auto Protection, or AAP—and NASC sell vehicle protection plans nationwide, including to consumers in Illinois and within this judicial district. Additionally, Endurance's principal place of business is in Northbrook, Illinois, and it regularly conducts business in Illinois.

## EVENTS GIVING RISE TO THIS ACTION

### ENDURANCE'S BUSINESS

27.     Since its founding in 2006, Endurance has worked hard to become the nation's

premier direct-to-consumer provider of vehicle service contracts. Endurance provides the most comprehensive and customer-centric auto protection, and is one of the largest providers of vehicle protection coverage in the United States.

28.     In connection with the sale and marketing of its products, Endurance owns and utilizes a series of federally-registered trademarks. Through these marks, along with its ongoing national advertising, marketing and promotional efforts, Endurance has generated substantial goodwill and consumer recognition.

29.     By virtue of Endurance's extensive, continuous, and exclusive promotion and use of the Endurance marks to advertise, promote, distribute, and sell vehicle service contracts, consumers across the United States recognize the Endurance marks and the Endurance brand as belonging to Endurance, associate the services offered and sold under the Endurance marks exclusively with Endurance, and recognize and trust Endurance as the source of the vehicle service contracts offered for sale and sold under the Endurance trademarks.

30.     Endurance has earned valuable goodwill from being recognized, associated with, and identified by consumers and the trade.

31.     Because of this, Endurance sells and markets its plans throughout the United States, with the exception of California (in which it uses a third-party administrator to sell a different product than a vehicle service contract). Throughout its extensive and ongoing national advertising, marketing, and promotional efforts, Endurance has generated and continues to maintain substantial goodwill and customer recognition.

32.     Indeed, because of its customer service, Endurance is a Better Business Bureau "Accredited Business."

33.     Being an "Accredited Business" means that Endurance has demonstrated to the

BBB that it has a commitment to ethical business standards, including building trust, advertising honestly, telling the truth, being transparent, honoring promises, being responsive, safeguarding privacy, and embodying integrity.

34.     Endurance has further demonstrated to the BBB that it is a reputable company, licensed, bonded, and insured, resolves complaints in a timely manner, follows through on its promises, and is committed to safe online transactions.

35.     Endurance's recognition extends beyond the BBB, including but not limited to winning three separate awards from Consumer Affairs' Buyers Choice Awards in 2025 for Best Customer Service, Best Value for Price, and Best Coverage Options, Newsweek's America's Best Online Platforms 2025, and receiving 21 separate Stevie Awards since 2014, including three in 2025 for Contact Center of the Year, National Sales Team of the Year, and Fastest Growing Company of the Year.

36.     Endurance offers a series of different products, ranging from comprehensive coverage to more affordable plans that cover core components. Endurance's vehicle service contracts cover newer, low-mileage vehicles, as well as older, high-mileage cars.

37.     Because of its customer service model and the coverage it provides, Endurance enjoys an excellent reputation in the industry and with the consumers it serves.

38.     As part of its business model, when Endurance acts as the seller, it sells an Endurance contract the vast majority of the time, and unlike other service providers, Endurance is the direct administrator of its own vehicle protection plans. For these contracts, Endurance handles everything with the consumer directly, from quote to claim, meaning no middleman. As a small part of its business, Endurance will sell contracts on behalf of other third-party administrators, who administer those plans. This paragraph does not speak to those third-party

8

administrator plans, but only the Endurance plans that Endurance sells and administers.

39. Because of this, Endurance is able to more quickly and more effectively administer claims brought by its consumers of Endurance plans.

40. As part of its business model and plan value for the plans it sells and administers, Endurance pays the mechanic directly for auto repairs, including all parts and labor.

41. And making Endurance a more attractive offer to its customers of Endurance plans, its protection plans are accepted by licensed repair facilities nationwide. Endurance also provides rental coverage with no deductible for up to five days, and provides towing at no cost for a certain preset amount of mileage.

42. Endurance also offers a number of other benefits through its plans, making it one of the most attractive options for individuals in the market for a vehicle service plan and leading to it earning a host of awards.

43. To generate its sales of vehicle service contracts to its customers, Endurance's customer leads are pre-generated. Endurance refers to its leads as "engaged leads," and these leads are stored in Endurance's CRM (Customer Relationship Management) software, and provided to its sales representatives to call.

44. The other means by which Endurance obtains leads is by individuals calling Endurance in response to Endurance's marketing materials. All leads contacted by a sales representative are pre-generated. Sales representatives do not engage in cold calling. Leads are not developed by sales people, but rather through prospective customers either calling Endurance directly or filling out a webform expressing interest.

45. This is particularly important fact because it means that Endurance's customers sought out Endurance, not the other way around. This detail is saliant and Endurance will discuss

9

it in greater detail below.

46. Endurance almost exclusively sells vehicle service contracts lasting four-years or longer, with the cost of the contract spread out over a set period of time, but paid on a monthly basis until the cost of the vehicle service contract is paid.

47. Endurance's pricing is generated on a car-by-car basis, based on things such as the make and model of the car, year of manufacture, odometer readings, and other items. Based on this, Endurance's proprietary software generates a price proposal.

48. Because Endurance's customers seek out Endurance, not the other way around, there is no centralized location through which Endurance's customer list can be acquired by legitimate means externally.

49. Because of this, Endurance's customer list is amongst its most valuable confidential information, and constitutes a trade secret.

50. Endurance's trade secret customer list is not known in the industry or by the general public and gives Endurance a competitive advantage to win and retain business with its customer base. The value of such information remaining confidential and a trade secret is immeasurable, but it is a driving factor in Endurance's several hundred million dollar per year business.

51. Unauthorized use of Endurance's trade secret customer list negatively and significantly impacts Endurance's ability to retain business.

52. And, as discussed below, Endurance has obtained information, both from Endurance's customers as well as a former employee of ASC, that Pelican has somehow acquired and is knowingly using Endurance's trade secret customer list to target Endurance's customers.

**ENDURANCE'S PROTECTION OF ITS CONFIDENTIAL INFORMATION AND TRADE SECRETS**

53.     Because of the critical nature of Endurance's trade secret customer list and how it allows Endurance to succeed, Endurance closely guards such information. Endurance takes specific measures to restrict access to and preserve the confidentiality of this information, including, but not limited to:

   a.  Requiring employees to sign agreements containing terms and covenants designed to maintain confidentiality and requiring the return of Endurance's property upon resignation or termination;

   b.  Requiring employees to maintain the confidentiality of Endurance's information;

   c.  Restricting access to computerized information through the use of passwords and a password-protected shared drive on its VPN network, and encrypting the data of the information on the servers;

   d.  Prohibiting the unauthorized physical removal of company information (via paper, disc, flash drive, or other media) and electronic transmission of such information (via email or other means);

   e.  Restricting access to computerized company information based on each individual employee's "need to know" in a confidential database; and

   f.  Removing employee access to trade secret information upon termination or release.

54.     Endurance rigorously maintains the confidentiality of its trade secret information because the information provides Endurance a competitive advantage in the marketplace from which Endurance derives economic value.

55.     Any Endurance competitor—including Defendants—who possess or use the Endurance's customer list would gain an immediate and unfair competitive advantage in the marketplace.

56.     Possession and use of this information would enable competitors to, among other improper advantages, specifically target customers that started with Endurance and where

Endurance nurtured and developed these relationships.

**DEFENDANTS KNOWINGLY MAKES FALSE STATEMENTS ABOUT ENDURANCE TO STEAL CUSTOMERS FROM ENDURANCE**

57.    Similar to Endurance, Defendants are engaged in the business of selling vehicle service contracts. Pelican sells contracts that Endurance believes, relevant to this lawsuit, are written for NASC. Endurance has been informed by at least two of its customers that, after they purchased a contract from Auto Service Department, a DBA of Pelican, the contract was to be administered by NASC.

58.    NASC also apparently sells at least some of its contracts directly as well as evidenced by the Endurance customers who have contacted Endurance informing it of NASC's direct attempts to engage in false advertising.

59.    Pelican operates and does business through a number of separate names, though, such as Auto Service Department, ASD, Auto Service Company, ASC, Affordable Auto Protection, and AAP. It is possible that Pelican does business through other entity names, but these are the ones Endurance has uncovered to date.

60.    Defendants solicit business from consumers nationwide. As for Pelican, when it convinces a consumer to purchase a vehicle service contract, relevant to this lawsuit and based on Endurance's information and belief, NASC then writes the contracts for that business, which includes contracts across the United States, including in Illinois.

61.    Among other companies, Pelican sells vehicle service contracts administered by NASC. On information and belief, this is governed pursuant to a written agreement between NASC and Pelican, which requires Pelican to comply with all laws and grants NASC authority to review, approve, and control Pelican's conduct.

62.     Based on other lawsuits to which NASC and Pelican are both parties, including but not limited to the Ohio Attorney General's lawsuit against Pelican and NASC from January 2023, NASC knows that Pelican mass-dials consumers without the consumers' permission, and then engages in unlawful sales tactics and false and misleading advertising.

63.     NASC's and Pelican's conduct is widely known and publicly documented in consumer complaints on the BBB's website.

64.     Despite NASC's knowledge of Pelican's improper and illegal sales tactics, including by way of a cease and desist letter sent by Endurance, by way of its counsel, to NASC and Pelican in November 2025, on information and belief, NASC has made no attempts to stop Pelican's conduct and continues to financially benefit from Pelican's conduct.

65.     Moreover, Endurance has recently received a number of calls in which Endurance customers identify an "NASC" as engaging in this conduct directly.

66.     As it relates specifically to Endurance, within the last several months, starting no later than September 2025, Endurance began receiving a series of cancellation calls and other calls from its customers.

67.     The common theme within each of these calls was that a third-party, identifying itself as "Auto Service Department," ASD, "Auto Service Company," ASC, or "NASC" was contacting Endurance's customers directly and spreading a series of lies, including that the customers were "red flagged," they were taking over Endurance's contracts, that Endurance was going out of business, and that a federal agency was suing Endurance.

68.     Endurance's customers initiate the transaction with Endurance by either providing their contact information on an Endurance website or contracted marketing service provider website or by reaching out directly.

69. Defendants are specifically targeting Endurance's customers, calling them without those customers requesting a call or expressing interest in Defendants' products or the products they are selling for other companies, including, for Pelican, on information and belief, its sales of contracts administered by NASC.

70. The fact that these customers are specifically targeted, told false information about Endurance, including that Endurance is going out of business, appear to be part of a deliberate scheme by Defendants to confuse and defraud these customers for the purpose of selling competing products to those customers.

71. In one such instance, an Endurance customer, who also happens to be an Endurance employee was contacted by a company that simultaneously identified itself as "ASD", "NASC", and "National Administrative Solutions Corporation." During the course of the call, a representative named "April" suggested that Endurance was being sued by the FTC.

72. Later in the same call, the Endurance employee asked how this company knew that he was an Endurance customer, and the representative was unable to answer that question.

73. For purposes of learning more, Salm signed up for the plan, and later received a booklet identifying the seller as "Auto Service Department," but on the inner panel of the book, it indicated that the seller was "Flex Home & Auto," with the contract to be administered by the Defendant NASC. Endurance is informed and believes that "Flex Home & Auto" is another DBA of Pelican.

74. Through its investigation, Endurance believes that, at a minimum, Pelican has misappropriated its trade secret customer list. Supporting this, on around October 15, 2025, while interviewing a candidate for a position with Endurance, this candidate, who was then employed by Auto Service Center, revealed to Endurance sales director, Darius Williams, that

14

ASC had CarShield's and Endurance's customer list and that ASC instructed ASC representatives to call Endurance's customers and poach them for ACS's product. ASC is one of the names by which Pelican does business.

75.     Endurance's customer list is not publicly available, and at no point has Endurance given a copy to Defendants.

76.     Moreover, Endurance has not and would not authorize a third party, including Pelican, to attempt to move Endurance's customers to an unrelated third party, like Defendants.

77.     This conduct by Pelican, for the benefit of and with knowledge of such conduct by NASC, is completely unauthorized, is wrongful, and violates the Lanham Act, the Illinois Trade Secrets Act ("ITSA"), the Defend Trade Secrets Act ("DTSA"), and other common laws. Additionally, NASC's conduct is also wrongful, and violates, on its own, the Lanham Act and other common laws, but that Pelican is knowingly using Endurance's trade secrets and with NASC's direct knowledge, makes NASC also in violation of the ITSA and DTSA.

78.     Among the specific lies or misleading statements that Endurance customers have relayed to Endurance that they have been told by Defendants or their sales representatives, which those customers then relayed to Endurance are:

a.   The customer's policies were "red flagged" with Endurance;

b.   A federal agency is suing Endurance;

c.   Endurance's policies are no longer in effect;

d.   Endurance is going out of business;

e.   Endurance is not covering claims; and

f.   Endurance's policies are not being accepted at "a lot of places."

79.     None of these claims are true, however.

80. In receiving these calls, Endurance's customers indicated that Defendants' representatives had "all my information," including name, VIN, and miles on the car, leading the customers to believe that what Defendants' representatives were saying was legitimate.

81. In making the calls, Defendants' representatives told the customer to cancel the payment with Endurance, pay a down payment on the Defendants' vehicle service contract, and call Endurance to cancel their plan.

82. As a result of this, Endurance has lost a number of customers of which it knows about and potentially countless others that did not provide this detail in cancelling their policy.

83. On or about November 7, 2025, outside counsel for Endurance sent a cease and desist letter to Defendants by overnight and certified mail. Through the letter, Endurance demanded that Defendants cease their use of Endurance's trade secret customer list and further cease their improper and unfair competition by spreading lies about Endurance. A true and correct copy of the letter is attached as Exhibit A.

84. Defendants never responded to Endurance's November 7, 2025 letter.

**EFFECT OF DEFENDANTS' CONDUCT**

85. With Pelican, at a minimum, possessing Endurance's trade secret customer list and using that list to move Endurance customers to Defendants, Endurance stands to lose substantial business as well as losing the value of its goodwill, customer relationships, trade secrets, and confidential and proprietary information, which cannot be adequately addressed at law.

86. Pelican is using Endurance's trade secret information to erode Endurance's standing in the vehicle service contract market, which has already cost Endurance and potentially will continue to cost Endurance the loss of a substantial amount of business to Defendants.

16

87.     Endurance's confidential information and customer relationships, however, are invaluable, the loss of which would provide an immediate benefit to Defendants, and an equally immediate irreparable detriment to Endurance's business.

88.     By Pelican possessing Endurance's trade secret customer list, Pelican—and by extension NASC—have used, threaten to use, and will continue to use Endurance's confidential, proprietary, and trade secret information.

89.     Defendants have and will continue to have an unfair advantage in targeting Endurance's customers.

90.     Moreover, Defendants have both engaged in false advertising in violation of the Lanham Act and the Illinois Deceptive Trade Practices Act.

91.     Defendants' actions are deliberate, willful, and calculated to mislead consumers and to unfairly compete with Endurance.

92.     Defendants have acted with knowledge of the falsity of their statements.

93.     Defendants' concerted conduct and scheme have caused and continues to cause substantial harm to Endurance, its sales, its goodwill, and its business reputation.

94.     All told, Defendants are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to Endurance, including the loss of value of confidential and/or proprietary information, the loss of long-standing customer relationships, loss of goodwill, as well as damage to Endurance's reputation as an industry leader and its ability to successfully market its goods and services. Money alone cannot make Endurance whole.

## COUNT I
### VIOLATION OF LANHAM ACT, SECTION 43(A), 15 U.S.C. §1125(A) – FALSE OR MISLEADING DESCRIPTION OF FACT AS TO ENDURANCE
### (ALL DEFENDANTS)

95. Endurance hereby repeats, realleges, and incorporates by reference the allegations that are contained in Paragraphs 1 through 94.

96. Defendants' conduct, as described herein, constitutes false and misleading representations of fact in commercial advertising or promotion in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

97. Defendants have intentionally made false and misleading statements to consumers including that: (a) Endurance is being sued by a federal agency; (b) Endurance is going out of business; (c) repair shops and car dealers will no longer accept Endurance coverage; (d) Endurance's policies are no longer in effect; and (e) Endurance is not covering claims.

98. Each of these statements is literally false, material, and likely to deceive consumers and influence purchasing decisions by diverting customers away from Endurance and toward Defendants.

99. Defendants' false and misleading statements have caused and continue to cause injury to Endurance, including loss of sales, diverted business, damage to goodwill, and harm to its business reputation and the value of its marks.

100. Endurance is entitled to recover its actual damages and Defendants' profits, as well as temporary, preliminary, and permanent injunctive relief, enhanced damages, punitive damages, costs, and attorneys' fees.

## COUNT II
### VIOLATION OF LANHAM ACT SECTION 43(A), 15 U.S.C. § 1125(A)
### VICARIOUS LIABILITY, AGENCY, APPARENT AUTHORITY, CONTRIBUTORY INFRINGEMENT
### (AGAINST NASC)

101.     Endurance hereby repeats, realleges, and incorporates by reference the allegations that are contained in Paragraphs 1 through 100.

102.     On information and belief, NASC entered into a written agreement with Pelican for Pelican to act as NASC's seller for marketing and promoting NASC's vehicle service contracts to consumers.

103.     On further information and belief, pursuant to that contract, NASC requires in writing that Pelican comply with all laws.

104.     On further information and belief, per that contract, NASC has the right to edit, approve, and/or control Pelican's advertising, but has not or willfully declined to control Pelican's sales and advertising activities.

105.     Pursuant to their written agreement, Pelican is the exclusive selling agent for NASC, and acting as NASC's exclusive selling agent, Pelican made unsolicited calls to Endurance's customers and others, and knowingly and intentionally, and with NASC's express knowledge and actual or implicit authority, intentionally misled and lied to consumers during those calls.

106.     NASC knew or should have known of Pelican's sales tactics and has constructive knowledge of Pelican's sales tactics through publicly available materials, including, but not limited to, BBB complaints, but has taken no efforts to curtail them.

107.     NASC has not taken appropriate efforts to prevent Pelican, as its sales agent, from intentionally misleading Endurance's customers about Endurance, its products, and Endurance's

ongoing viability as a company. NASC has failed to take these steps despite Pelican having a contractual obligation to comply with the law, including, by extension, the Lanham Act.

108.    By failing to take appropriate measures to prevent its agent Pelican from intentionally misleading consumers about Endurance and Endurance's products, NASC has ratified and affirmed the sales tactics of its sales agent, Pelican.

109.    NASC has directly benefited from Pelican's sales tactics by obtaining sales it would not otherwise have made but for Pelican's false and misleading statements to Endurance's customers.

110.    To wit, despite Endurance sending NASC a cease and desist letter in November 2025 to demand that this conduct stop, Pelican has not stopped its conduct and NASC continues to honor the vehicle service contracts that derive from Pelican's false promotion of NASC's products, including those that arose from Pelican's false and misleading statements about Endurance.

111.    On information and belief, when Pelican completes a sale to a customer, NASC causes its contract with the customer to be sent to that consumer, which notes that it is an NASC contract, and directs to consumer to communicate with NASC on a going-forward basis.

112.    Accordingly, NASC also provides apparent authority for Pelican's conduct in that a reasonable consumer would believe that NASC consents to Pelican's sales tactics as if done at NASC's direction and with NASC's knowledge.

113.    NASC materially contributed to or induced the false advertising by providing the vehicle service contract for Pelican to sell, knowing of Pelican's false and misleading statements and failing to take steps to stop them, and from continuing to benefit from Pelican's false and misleading statements to Endurance customers for the purpose of poaching those customers from

20

Endurance to NASC.

114.    As a direct and proximate result of NASC using Pelican as its selling agent, Pelican utilizing false and misleading statements about Endurance to Endurance's customers, and continuing to maintain the contracts that derive from Pelican's false and misleading statements about Endurance when promoting NASC's products, NASC is vicariously liable for Pelican under the theory of agency, apparent authority, and contributory infringement, and Endurance is entitled to damages from NASC in an amount to be determined at trial.

115.    Further, because NASC has shown a continuing and ongoing pattern of failing to monitor its sales agents—as more thoroughly discussed in Endurance's contemporaneously-filed motion for temporary restraining order—Endurance should be awarded temporary, preliminary, and permanent injunctive relief prohibiting any party on NASC's behalf from engaging in similar sales tactics against Endurance for the purpose of selling NASC products. Endurance also is entitled to recover its actual damages and NASC's profits, enhanced damages, punitive damages, costs, and attorneys' fees.

## <u>COUNT III</u>
### MISAPPROPRIATION OF TRADE SECRETS - ILLINOIS UNIFORM TRADE SECRETS ACT
#### (AGAINST ALL DEFENDANTS)

116.    Endurance hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 94.

117.    Endurance's confidential and proprietary information include, *inter alia*, its client and customer lists and other information determined by Endurance to be confidential.

118.    This information constitutes trade secrets, pursuant to the Illinois Uniform Trade Secret Act, 765 ILCS 1065/1, *et seq.*, because Endurance derives independent economic value from this information not being generally known to the public and not being readily ascertainable

by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

119. Defendants actually have misappropriated Endurance's trade secrets without its consent, in violation of Illinois law. Defendants acquired and are using trade secrets that they know to be the trade secrets of Endurance and were acquired by improper means.

120. Specifically, as discussed above, Defendants are using and disclosing and will continue to use and disclose Endurance's trade secrets relating to Endurance's customer list to unfairly compete against Endurance.

121. Defendants' actions are willful and malicious.

122. Defendants are being and will continue to be unjustly enriched by their misappropriation of Endurance's trade secrets and, unless restrained, Defendants will continue to use, divulge, and otherwise misappropriate Endurance's trade secrets and confidential information.

123. Because of the actual misappropriation of Endurance's trade secrets, Endurance has been injured and faces irreparable injury. In addition to a remedy at equity, Endurance seeks actual, incidental, compensatory, punitive, consequential damages, and attorney's fees and costs.

## COUNT IV
### VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §1832, *ET SEQ.*
### (AGAINST ALL DEFENDANTS)

124. Endurance hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 94.

125. The Defend Trade Secrets Act ("DTSA") defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof

has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public. *See* 18 U.S.C. §§ 1836, 1839.

126. Defendants acquired Endurance's trade secrets by improper means and without authorization.

127. Defendants are using, without authorization and with knowledge that they are not authorized to use Endurance's trade secrets including Endurance's trade secret customer list, which constitutes a trade secret within the meaning of the DTSA. Such information derives independent economic value from not being generally known to, or readily ascertainable by proper means by, the public; other persons can obtain economic value from its disclosure or use; and it is the subject of significant efforts to maintain its secrecy.

128. As detailed above, Endurance takes reasonable and appropriate measures to protect the confidentiality of the above-described trade secrets.

129. Defendants knew or should have known that Endurance's trade secrets: (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) were developed or acquired by Endurance at great expense and effort; (d) are maintained as confidential and are not generally available to the public or Endurance's competitors; (e) would provide significant benefit to a competitor seeking to compete with Endurance; and (f) are critical to Endurance's ability to conduct its business successfully.

130. As detailed above, Defendants have wrongfully used Endurance's trade secrets.

131. By disclosing and/or continuing to threaten to disclose Endurance's trade secrets without Endurance's consent, Defendants have misappropriated and continue to threaten to

misappropriate Endurance's trade secrets in violation of the DTSA, which allows injunctive relief for actual or threatened misappropriation of trade secrets.

132.    The information that Defendants have misappropriated or threaten to misappropriate relates to Endurance's trade secret customer list, which involve products that are sold in, utilized throughout, and/or travel through interstate commerce.

133.    Should Defendants continue to disclose or threaten to disclose Endurance's trade secrets, the disclosure of such information will harm and/or threaten to harm Endurance and its legitimate business interests.

134.    Defendants' actions were willful and malicious.

135.    If information pertaining to Endurance's trade secrets are continued to be utilized by Defendants or other competitors of Endurance, it could destroy Endurance's competitive advantage.

136.    Because Defendants' misconduct is ongoing and it poses a threat of significant irreparable harm that cannot be compensated by money alone, Endurance requests that this Court grant injunctive relief against Defendants from actual or threatened disclosure or utilization of Endurance's trade secrets, in addition to granting Endurance its actual, incidental, compensatory, punitive, exemplary, consequential damages, and attorney's fees and costs

**COUNT V**
**(DECEPTIVE TRADE PRACTICES – 815 ILCS §§ 510/1, *ET SEQ.*)**
**(AGAINST ALL DEFENDANTS)**

137.    Endurance hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 94.

138.    Defendants have knowingly and willfully engaged in deceptive trade practices within the meaning of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/1 *et*

*seq.*, by disparaging the goods, services, and/or business of Endurance through the use of false or misleading representations of fact.

139. The foregoing acts of Defendants constitute willful, deceptive acts and practices in the conduct of business, trade and/or commerce, in violation of Illinois Uniform Deceptive Trade Practices Act, 815 ILCS Sections 510/1 *et seq.*, for which Endurance is entitled to injunctive relief, attorneys' fees, and costs.

140. The foregoing acts of Defendants will create a likelihood of injury to the public image and business reputation of Endurance in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §§ 510/1 *et seq.*, for which Endurance is entitled to injunctive relief.

141. The foregoing acts of Defendants were designed intentionally to mislead and deceive the public in violation of 815 ILCS §§ 510/1 *et seq.*, for which Endurance is entitled to injunctive relief.

142. Further, Endurance has learned that NASC has also engaged in similar conduct based on a customer review provided on the Better Business Bureau website. Specifically, that review stated:





⭐☆☆☆☆

They called claiming to be only warranty company accepted at dealerships because they are only sold at dealerships. Then when discussing coverages, the agent argued that I couldn't get coverage for specific pieces that are covered by competitors, mainly the infotainment systems. In my own experience other companies have covered this and the claims were paid. This agent chose to argue with me and claim that could never happen then hung up the phone. I also asked the agent to compare themselves to others like Endurance and ▮▮▮▮▮▮▮, to which they disparaged both companies, and became very pushy. All these are red flags and I would not encourage anyone to do business with a company that promotes such policies as arguing with a potential customer, speaking poorly of others in the same industry (by comparison, I could not get Endurance to speak poorly of anyone) and then hang up on customers who are asking specific questions about policy, why they aren't BBB accredited, coverage limitations, etc. As a consumer, I am doing my diligence when purchasing a product. If you want to sell me something, come ready to sell, not bail when the conversation requires you to answer potentially difficult questions. I would not recommend this company to anyone, especially if you are not one to do much research on your own. Just ignore or hang up. They may also claim to be under the umbrella of Allegience. Do your homework there also.

Better Business Bureau, *National Administrative Service Co. LLC – Customer Reviews*, https://www.bbb.org/us/oh/dublin/profile/auto-warranty-processing/national-administrative-service-co-llc-0302-11005532/customer-reviews (last visited Jan. 29, 2026).

143. The false and misleading statements made by Defendants are causing and is likely to cause substantial injury to the public and to Endurance.

<u>**COUNT VI**</u>
**(ILLINOIS COMMON LAW – DEFAMATION PER SE)**
**(AGAINST DEFENDANTS)**

144. Endurance hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 94.

145. Defendants' statements about Endurance are false.

146. Defendants have published their statements about Endurance's ongoing viability, specifically their claim that Endurance is going out of business, to third-party consumers.

147. Defendants made these statements with actual knowledge or reckless indifference to their truth or falsity.

148.    Upon information and belief, Defendants' conduct was and continues to be willful, intentional, and in bad faith.

149.    Defendants' acts have caused, and continue to cause, damage to Endurance.

150.    Endurance is entitled to recover its damages.

### COUNT VII
### (ILLINOIS COMMON LAW – TORTIOUS INTERFERENCE WITH CONTRACT)
### (AGAINST DEFENDANTS)

151.    Endurance hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 94.

152.    Endurance sells vehicle service contracts to consumers.

153.    Defendants have knowledge of the contractual relationships between Endurance and consumers, as Defendants reference these contracts in their sales calls with Endurance customers

154.    During those calls, Defendants intentionally instructs customers how to cancel their Endurance contracts after purchasing Defendants' contracts, and in so doing Defendants provide false information about Endurance to induce the customers to terminate their contracts with Endurance.

155.    Defendants intentionally induce Endurance customers to terminate their contracts with Endurance. Defendants' interference is improper as they do so through false and misleading statements.

156.    Defendants' conduct was willful and malicious and was done with an intent to harm Endurance.

157.    As a direct result, Endurance has suffered and will continue to suffer monetary losses in an amount to be proven at trial. In an addition to remedies in equity, Endurance seeks

actual, incidental, compensatory, punitive, exemplary, and consequential damages, as well as attorney's fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Endurance Warranty Services, L.L.C. seeks judgment in its favor and an Order against Defendants Pelican Investment Holdings, LLC and National Administrative Service Co., LLC, for the following relief:

A. Temporarily, preliminarily and permanently enjoining, without bond, Defendants and all parties in active concert or participation with him, from using or disclosing any of Endurance's confidential, proprietary, and/or trade secret information, including Endurance's customer list;

B. Temporarily, preliminarily and permanently enjoining, without bond, Defendants from utilizing false and deceptive practices including claiming Endurance is going out of business, is being sued by a federal agency, and/or that its service contracts are not being accepted;

C. Ordering Defendants and all parties in active concert or participation with them, to return to Endurance all originals and copies of all files, devices and/or documents that contain or relate to Endurance's confidential, proprietary, and trade secret information;

D. Ordering Defendants and all parties in active concert or participation with them, to preserve all documents, data, and electronic information and to produce for inspection and imaging all computers and other electronic storage devices and email accounts containing Endurance's trade secret customer list;

E. Awarding Endurance actual, incidental, compensatory, and consequential damages to be proven at trial;

G. Awarding Endurance exemplary or punitive damages in an amount to be proven at trial due to Defendants' willful and malicious activities;

H. Awarding Endurance its reasonable attorney's fees and costs; and

I. Awarding Endurance such further relief as the Court deems necessary and just.

DATED:  FEBRUARY 4, 2026

Respectfully submitted,

**ENDURANCE WARRANTY SERVICES, L.L.C.**

By: */s/ Justin K. Beyer*
     One of Its Attorneys

Steven M. Malitz (steven.malitz@saul.com)
Joseph M. Kuo (josph.kuo@saul.com)
Justin K. Beyer (justin.beyer@saul.com)
Saul Ewing LLP
161 North Clark Street, Suite 4200
Chicago, Illinois  60601
Telephone:  (312) 876-7100

*Attorneys for Plaintiff Endurance Warranty Services, L.L.C.*